# EXHIBIT 31

```
                                                                    1

         IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF NEW JERSEY


 TAKEDA PHARMACEUTICAL          )
 COMPANY LIMITED, TAKEDA        )
 PHARMACEUTICALS NORTH          )
 AMERICA, INC., TAKEDA          ) Civil Action No.
 PHARMACEUTICALS LLC, TAKEDA    ) 3:11-CV-02506-
 PHARMACEUTICALS AMERICA,       ) JAP-DEA
 INC., and ETHYPHARM, S.A.,     )
              Plaintiffs,       )
                                )
           vs.                  )
                                )
 MYLAN PHARMACEUTICALS,         )
 INC.,                          )
              Defendant.        )
 _____  )


          DEPOSITION OF DR. RUSSELL MUMPER
               New York, New York
                 June 6, 2012




 Reported By:
 CATHI IRISH, RPR, CLVS, CCR
```

## Page 2

```
                June 6, 2012
                 9:30 a.m.

      Deposition of DR. RUSSELL MUMPER, held
at the offices of Alston & Bird, 90 Park
Avenue, New York, New York, before Cathi
Irish, a Registered Professional Reporter and
Notary Public of the State of New York.
```

## Page 3

```
A P P E A R A N C E S:

   HOGAN LOVELLS US LLP
   Attorneys for Plaintiffs
       875 Third Avenue
       New York, New York 10022
   BY:  ARLENE L. CHOW, ESQ.
        TAKASHI OKUDA, ESQ.

   ALSTON & BIRD LLP
   Attorneys for Defendant
       90 Park Avenue
       New York, New York 10016
   BY:  DEEPRO R. MUKERJEE, ESQ.
```

## Page 4

D R.  R U S S E L L  M U M P E R,  called
as a witness, having been duly sworn by a
Notary Public, was examined and testified
as follows:
EXAMINATION
BY MS. CHOW:
   Q.   Good morning.
   A.   Good morning.
   Q.   How many times have you been deposed?
   A.   One time previously.
   Q.   Was that in the context of a patent litigation?
   A.   It was.
   Q.   How many times have you prepared an expert report?
   A.   I prepared two for the Watson Cephalon trial and so those are expert reports, and I obviously prepared the declaration for this trial.
   Q.   Okay.  For the Watson case, did you prepare an expert report in relation to claim construction?
   A.   No.
   Q.   Just generally, was it in relation to infringement, validity?

## Page 5

                    MUMPER
   A.   It was -- the first one was infringement.  Second one was validity.
   Q.   And did that case involve an orally disintegrating tablet?
   A.   It did.
   Q.   Did that case go to trial?
   A.   It did.
   Q.   What was the product at issue?
   A.   This was Cima and Cephalon, two companies.  This was their Fentora product, buccal effervescent fentanyl.
   Q.   So that product was a buccal effervescent ODT; is that correct?
       MR. MUKERJEE:  Objection.
       MS. CHOW:  You may answer.
       MR. MUKERJEE:  You may answer.
       THE WITNESS:  Yes.
BY MS. CHOW:
   Q.   Where did that ODT disintegrate?
   A.   In the buccal cavity.
   Q.   What do you mean by in the buccal cavity?
   A.   That the Fentora product was meant to be inserted into the mouth, placed against the

Page 6

```
                            MUMPER
 1
 2   cheek, the buccal tissue, and disintegrate at that
 3   point.
 4       Q.   Now, that product was an ODT so that
 5   was an orally disintegrating tablet; is that
 6   correct?
 7           MR. MUKERJEE:  Objection.
 8           THE WITNESS:  That is correct.
 9   BY MS. CHOW:
10       Q.   Could that product be administered
11   outside of the mouth?
12       A.   Can you clarify by what you mean
13   administered outside of the mouth.
14       Q.   I understand.  Were there different
15   forms of administration for that product?
16       A.   The prescribing information had
17   explicit instructions that the tablet was to be
18   placed in the mouth against the buccal tissue at
19   which time it would disintegrate, produce
20   effervescence and the claim was that effervescence
21   would promote absorption of the active fentanyl.
22       Q.   Was that product disintegrated outside
23   of the mouth in water prior to administration to
24   the patient?
25           MR. MUKERJEE:  Objection, form.
```

Page 7

```
                            MUMPER
 1
 2           THE WITNESS:  I don't know if it was.
 3       I do know.  I recall from the prescribing
 4       information that it was very clear that it was
 5       to be placed in the mouth.  Now, did patients
 6       -- or doctors instruct their patients to
 7       predissolve it in water?  They may have.  I
 8       have no knowledge of that.
 9   BY MS. CHOW:
10       Q.   For your infringement report, did you
11   opine on claim construction of the patent?
12           MR. MUKERJEE:  Objection, asked and
13       answered.
14           THE WITNESS:  No, claim -- there was an
15       agreement before I was to write my expert
16       reports about claim construction, so I didn't
17       write a report specifically about claim
18       construction.  There may have been in my
19       noninfringement report my opinions about what
20       certain terms meant.
21   BY MS. CHOW:
22       Q.   Okay.  Are you saying that there was a
23   claim construction in place prior to your opining
24   on infringement; is that what you're saying?
25       A.   As I recall, the judge was deferring
```

Page 8

```
                            MUMPER
 1
 2   claim construction judgment and was including
 3   that in the noninfringement and validity
 4   contentions to be decided at trial, is my best
 5   understanding.
 6       Q.   What law firm did you work with in that
 7   case?
 8       A.   Frommer Lawrence & Haug.
 9           MS. CHOW:  I'm going to mark as Mumper
10       Exhibit 1 U.S. patent 6,328,994.
11           (Mumper Exhibit 1, U.S. patent
12       6,328,994, marked for identification.)
13   BY MS. CHOW:
14       Q.   Do you recognize this document?
15       A.   Yes.
16       Q.   Is it the patent-in-suit or one of the
17   patents-in-suit at issue in this case?
18       A.   Yes.
19       Q.   I'd like to direct your attention to
20   claim 1.  It's in column 37.
21           As you can see, claim 1 includes a
22   sustained-release agent.  Do you see that?
23           MR. MUKERJEE:  Objection.
24           THE WITNESS:  I see sustained-release
25       agent listed in claim 1.
```

Page 9

```
                            MUMPER
 1
 2   BY MS. CHOW:
 3       Q.   Okay.  What is the purpose of the
 4   sustained-release agent in claim 1 of the '994
 5   patent?
 6           MR. MUKERJEE:  Objection.
 7           THE WITNESS:  As I understand the
 8       purpose of the sustained-release agent as
 9       written in the '994 patent is the traditional
10       meaning of a sustained-release agent as known
11       by people skilled in the art on what a
12       sustained-release agent would do to prolong or
13       sustain drug release based on producing
14       diffusional barrier to control the rate of
15       drug release and defusion through that barrier
16       over time.  Ultimately to sustain blood levels
17       over a period of time.
18   BY MS. CHOW:
19       Q.   Is it your position that the orally
20   disintegrable tablet described in claim 1 of the
21   '994 patent is a sustained-release product?
22           MR. MUKERJEE:  Objection.
23           THE WITNESS:  That's not my position.
24       My position is that the tablet described in
25       claim 1 contains a sustained-release agent.
```

```
                                       10
 1                    MUMPER
 2   BY MS. CHOW:
 3        Q.   So is it your position that the tablet
 4   contains a sustained-release agent but it does not
 5   have sustained-release functionality?
 6             MR. MUKERJEE:  Objection.
 7             THE WITNESS:  I have no knowledge on
 8        whether the tablet described in claim 1 has
 9        sustained-release properties.  My position is
10        the tablet in claim 1 contains a
11        sustained-release agent that was well known at
12        the time of filing to provide certain
13        functions and those were described in my
14        declaration.
15   BY MS. CHOW:
16        Q.   So it is your understanding that the
17   tablet described in claim 1 of the '994 patent
18   does not necessarily have sustained-release
19   properties?
20             MR. MUKERJEE:  Objection,
21        mischaracterizes his testimony.
22             THE WITNESS:  My position is that the
23        tablet that's described in claim 1 may not
24        necessarily be a sustained-release tablet but
25        that it contains a sustained-release agent by
```

```
                                       11
 1                    MUMPER
 2        definition.
 3   BY MS. CHOW:
 4        Q.   So why is a sustained-release agent
 5   included in the tablet described by claim 1 of the
 6   '994 patent?
 7             MR. MUKERJEE:  Objection.
 8             THE WITNESS:  So in my reading of the
 9        '994 patent, it is silent as to the purpose of
10        the inclusion of a sustained-release agent in
11        the tablet that's described in claim 1.  In
12        the specifications that mention the term
13        sustained-release agent, that has well-known
14        meaning in the field to people of ordinary
15        skill.  And so I look at the sustained-release
16        agent, its well-known function to control or
17        sustain drug release, and I would conclude
18        that it was -- I would conclude that it was
19        included in the tablet to impart those types
20        of properties.
21   BY MS. CHOW:
22        Q.   So is it your position that you can
23   surmise what the purpose of the sustained-release
24   agent is in the tablet described by claim 1 of the
25   '994 patent based on your understanding of one of
```

```
                                       12
 1                    MUMPER
 2   skill in the art but not based on what is taught
 3   in the specification?
 4             MR. MUKERJEE:  Objection.
 5             THE WITNESS:  Can you repeat that
 6        question, please?
 7   BY MS. CHOW:
 8        Q.   So is it your position that you can
 9   surmise what the purpose of the sustained-release
10   agent is in the tablet described by claim 1 of the
11   '994 patent based on your understanding of one of
12   skill in the art but not based on what is taught
13   in the specification?
14             MR. MUKERJEE:  Same objection.
15             THE WITNESS:  So my position is that
16        the '994 patent, the specifications talk about
17        a sustained-release agent but they don't teach
18        explicitly and literally the function of the
19        sustained-release agent.  So as I read that, I
20        understand what a sustained-release agent is
21        and what its purpose is and I conclude that
22        that was the purpose of the sustained-release
23        agent in claim 1.
24             I understand in looking at the
25        prosecution history, the Shimizu declaration
```

```
                                       13
 1                    MUMPER
 2        and the Byrn declaration, that they are
 3        alleging that the sustained-release agent has
 4        a different function as I conclude that the
 5        sustained-release agent would have after
 6        reading the '994 patent.
 7   BY MS. CHOW:
 8        Q.   Let's go to the patent, column 19,
 9   lines 9 through 31.
10             Are you there?
11        A.   Column 19, lines 9 through 31.
12        Q.   Actually it's probably more -- sorry,
13   starting at line 25.  So it's more 25 to 31.  It's
14   a portion of the specification described as acid
15   resistance, okay?  Do you see the acid resistance
16   test?
17        A.   I do.
18        Q.   What is the purpose of the
19   acid-resistance test in the '994 patent as set
20   forth under column 19?
21             MR. MUKERJEE:  Objection.  Dr. Mumper
22        can take as much time as he needs.
23   BY MS. CHOW:
24        Q.   Dr. Mumper, is this the first time
25   you've considered this question, what is the
```

|  | 14 |  | 16 |
|---|---|---|---|
| 1 | MUMPER | 1 | MUMPER |
| 2 | purpose of the acid-resistance test in the '994 | 2 | does. |
| 3 | patent? | 3 | Q.   In preparing your report, did you |
| 4 | MR. MUKERJEE:  Objection. | 4 | investigate the physical properties of known |
| 5 | THE WITNESS:  No. | 5 | sustained-release agents? |
| 6 | BY MS. CHOW: | 6 | MR. MUKERJEE:  Objection. |
| 7 | Q.   So my question -- | 7 | THE WITNESS:  In preparing my report, |
| 8 | A.   Can you repeat the first question? | 8 | and specifically to help develop my opinion on |
| 9 | (Record read.) | 9 | the term sustained-release agent, I did do -- |
| 10 | MR. MUKERJEE:  Same objection. | 10 | I relied on references that are in my |
| 11 | THE WITNESS:  In my opinion, the | 11 | declaration as well as my own knowledge of |
| 12 | purpose of the acid-resistance test is to | 12 | what a sustained-release agent function is in |
| 13 | verify the integrity of the enteric coating on | 13 | an orally -- in oral tablets. |
| 14 | the granule and my opinion is consistent with | 14 | BY MS. CHOW: |
| 15 | what is taught in the '994 patent.  I'm | 15 | Q.   Do you have any understanding as to |
| 16 | looking for that particular paragraph and I | 16 | whether or not known sustained-release agents can |
| 17 | have not been able to identify it on this | 17 | be used to cushion enteric coats? |
| 18 | document. | 18 | A.   Can you repeat the question? |
| 19 | BY MS. CHOW: | 19 | Q.   Do you have any understanding as to |
| 20 | Q.   In the '994 patent, what helps protect | 20 | whether or not known sustained-release agents can |
| 21 | the integrity of the enteric coat of the orally | 21 | help protect the integrity of enteric coats on |
| 22 | disintegrating tablet? | 22 | tablets? |
| 23 | MR. MUKERJEE:  Objection. | 23 | A.   I'd like you to repeat the question |
| 24 | THE WITNESS:  You said orally | 24 | because I think you asked two different forms that |
| 25 | disintegrating tablet? | 25 | have two different meanings to me of what a |

|  | 15 |  | 17 |
|---|---|---|---|
| 1 | MUMPER | 1 | MUMPER |
| 2 | BY MS. CHOW: | 2 | sustained-release agent would be doing. |
| 3 | Q.   In the tablet taught by the '994 | 3 | Q.   Do you have any understanding as to |
| 4 | patent, what helps protect the integrity of the | 4 | whether or not known sustained-release agents can |
| 5 | enteric coat? | 5 | help protect the integrity of the enteric coat? |
| 6 | MR. MUKERJEE:  Objection. | 6 | A.   I have knowledge of agents that have |
| 7 | THE WITNESS:  So the '994 patent | 7 | been included in enteric coatings that are |
| 8 | teaches an orally disintegrable tablet which | 8 | intended to be added during the enteric coating |
| 9 | in my opinion is different.  What protects the | 9 | process.  These agents may have other functions in |
| 10 | integrity of the enteric coating is the fact | 10 | the -- in dosage forms such as sustained-release. |
| 11 | that the enteric coating agent has specific | 11 | Q.   You're not answering my question.  The |
| 12 | physical chemical properties and when it is | 12 | question was very specifically tailored to |
| 13 | coated on the granules is insoluble and will | 13 | protecting the integrity of the enteric coat.  I'm |
| 14 | not dissolve at low pH of the stomach, will | 14 | using your own words, okay, so do you have any |
| 15 | dissolve at higher pHs as the acidic moieties | 15 | understanding whether or not sustained-release |
| 16 | become ionized. | 16 | agents can help protect the integrity of the |
| 17 | BY MS. CHOW: | 17 | enteric coat? |
| 18 | Q.   Does the sustained-release agent help | 18 | MR. MUKERJEE:  Objection, asked and |
| 19 | protect the integrity of the enteric coat in the | 19 | answered. |
| 20 | tablet taught by the '994 patent? | 20 | THE WITNESS:  I think I am answering |
| 21 | A.   I have no specific knowledge on whether | 21 | the question.  Excipients in dosage forms, if |
| 22 | the sustained-release agent helps protect the | 22 | you look at the Handbook of Pharmaceutical |
| 23 | integrity of the enteric coating on top of the | 23 | Excipients, Merck Index, they can have many |
| 24 | granules.  I know that in the Shimizu declaration, | 24 | different functions and what I said was that |
| 25 | it was claimed and concluded by Shimizu that it | 25 | agents can be -- I'm aware of agents being |

**Page 34**

MUMPER

Application Publication 2009/0304789, marked for identification.)

BY MS. CHOW:

Q. I'm just going to direct your attention to paragraphs 84 and 86 which is on page 5.

A. Can you tell me again the paragraphs you would like me to look at?

Q. Paragraph 84 and then paragraph 86, and just so you know where I'm going, paragraph 86 mentions Eudragit L30D-55 so that's --

A. I've read paragraphs 84 and 86.

Q. Does U.S. 2009/0304789 teach that Eudragit L30D-55 can be used as a sustained-release agent?

MR. MUKERJEE: Objection. Again, Dr. Mumper, if you need to read any other portions for context, feel free to do so.

THE WITNESS: I would have to read the whole -- this is the first time I've seen this patent application publication, so I would have to read the whole thing to understand what they are teaching.

BY MS. CHOW:

Q. Based on what you've read so far, is

**Page 35**

MUMPER

this patent application associating Eudragit L30D-55 with sustained-release functionality?

MR. MUKERJEE: Objection. Again, if you need to read other portions for context, feel free to do so.

THE WITNESS: I don't know what it's associating until I read the whole patent.

BY MS. CHOW:

Q. Is it possible for a specific Eudragit to be used as both a sustained-release agent and an enteric coating agent?

A. I think the answer to that question is related to my clarification request before, as in what context? In the context of coating a drug-coated inert core where you have an enteric coating and that enteric coating of a Eudragit must have well-known properties to be an enteric coating, or is it in general, any Eudragit available in any context in any dosage form, whether it be a granule, a tablet, a gel, anything. Can it be used as both? Is that what you're asking, the latter?

Q. I'm asking you as one of skill in the art, is it your understanding that a specific

**Page 36**

MUMPER

Eudragit can be used as both a sustained-release agent and an enteric coating agent? Is that possible?

MR. MUKERJEE: Objection.

THE WITNESS: I think that question needs context for me. Again, if it's an oral dosage form and you have a coated tablet or coated granules and you want to impart acid resistance to its context, you need certain properties of that Eudragit.

Specifically as it relates to '994, if you wanted to impart an enteric coating to granules to provide acid resistance, that coating of the appropriate enteric coating agent would not be a sustained-release agent. So I think to answer your question in the most general way, I would need to take a specific dosage form understanding what functions you wanted to have of that dosage form to answer that question.

BY MS. CHOW:

Q. Now, you previously testified that you reviewed the Shimizu declaration that was submitted during the prosecution of the '994

**Page 37**

MUMPER

patent in relation to the acid-resistance test; is that right?

A. I reviewed the Shimizu declaration.

Q. Is it your understanding that Dr. Shimizu represented that the sustained-release agent was used in the '994 to help protect the integrity of the enteric coat?

MR. MUKERJEE: Objection.

THE WITNESS: As I recall from the declaration of Dr. Shimizu, that he utilized the example 9 in the '994 patent and compared that to a prior art formulation and concluded in the declaration or tested the two formulations, one from example '994 and one from the prior art and looked at acid-resistance, and from that acid-resistance data made the conclusion that the example 9 in the '994 patent provided greater acid-resistance which he attributed to the ability of the sustained-release agent to cushion or provide protection to the enteric coating layer.

BY MS. CHOW:

Q. So it's your understanding that the

|  38 |  40 |
|---|---|
| 1  MUMPER | 1  MUMPER |

Page 38:

```
 1                    MUMPER
 2   inventor told the PTO during the prosecution of
 3   the '994 patent that the sustained-release agent
 4   provided protection to the enteric coating layer;
 5   is that correct?
 6          MR. MUKERJEE:  Objection.  Maybe,
 7       Arlene, you want to put the declaration in
 8       front of the witness.
 9          THE WITNESS:  Can I have the
10       declaration to review?
11          MS. CHOW:  Sure.  I was just restating
12       your testimony.  I was repeating it.
13          Let's mark as Mumper 4 a declaration by
14       Toshihiro Shimizu dated December 18, 2000.
15          (Mumper Exhibit 4, declaration by
16       Toshihiro Shimizu, marked for identification.)
17          THE WITNESS:  My recollection as I just
18       stated is consistent with Shimizu's conclusion
19       in the -- in his declaration that the example
20       B from example 9 in '994 had suitable strength
21       and was not damaged through production and had
22       superior acid-resistance, and he concluded
23       that the coating layer of fine granules of the
24       present invention are not damaged after
25       compression or shock and further has superior
```

Page 39:

```
 1                    MUMPER
 2       acid resistance.  His conclusion is
 3       consistent with my recollection as I just
 4       described.
 5   BY MS. CHOW:
 6       Q.   And he concluded that the
 7   sustained-release agent was responsible for the
 8   superior acid-resistance, correct?
 9       A.   He did not explicitly state that in the
10   conclusion.  What he explicitly stated was that
11   the coating layer is not damaged and has superior
12   acid-resistance.  His conclusion did not
13   explicitly state that it was because of the
14   sustained-release agent.
15       Q.   But you derive that from his
16   declaration?
17          MR. MUKERJEE:  Objection.
18          THE WITNESS:  I'm acknowledging what
19       he's concluding as his conclusion.  He didn't
20       conclude specifically and literally that the
21       sustained-release agent was responsible for
22       providing that superior acid-resistance.  In
23       comparing example A to example B, those were
24       different formulations with different
25       ingredients and so...
```

Page 40:

```
 1                    MUMPER
 2   BY MS. CHOW:
 3       Q.   Is it your position that this Shimizu
 4   declaration, which is Mumper 4, has no bearing on
 5   the claim construction for, in quotes, "an enteric
 6   coating layer comprising a first component which
 7   is an enteric coating agent and a second component
 8   which is a sustained-release agent"?
 9          MR. MUKERJEE:  Objection, form.
10          THE WITNESS:  You asked if that's my
11       position or -- that's not my position.
12   BY MS. CHOW:
13       Q.   So it's your position that Mumper 4,
14   which is the Shimizu declaration, has bearing on
15   the claim construction for, in quotes, "an enteric
16   coating layer comprising a first component which
17   is an enteric coating agent and a second component
18   which is a sustained-release agent"?
19       A.   I believe that the Shimizu declaration
20   is very important for -- and I used it and relied
21   upon it to determine claim construction as it
22   relates to the '994 patent.
23       Q.   Now, let's look at the patent again.
24   I'm just going to grab an example.  Let's just
25   take example 1, okay?
```

Page 41:

```
 1                    MUMPER
 2       A.   I'm sorry, this is the '994?
 3       Q.   Yes, Mumper 1.
 4       A.   Okay.
 5       Q.   Now, example 1 includes Eudragit NE30D
 6   and enteric coat.  Do you see that?  That's in
 7   column 20 of the '994 patent.
 8       A.   In column 20, line 32 or so I see
 9   Eudragit NE30D.
10       Q.   In example 1, is the Eudragit NE30D
11   used to release the active ingredient at a
12   predetermined rate in order to maintain a constant
13   or prolonged drug concentration for a specific
14   period of time?
15       A.   I'm sorry, you said L30D-55.
16       Q.   No.  Oh, you're reading into my
17   question but no.  Example 1.  That's funny.
18          Is the Eudragit NE30D used to release
19   the active ingredient at a predetermined rate in
20   order to maintain a constant or prolonged drug
21   concentration for a specific period of time?
22       A.   So NE30D and why it's used in example
23   1?
24       Q.   Yes, that's correct?
25       A.   Or its function in example 1.
```

11 (Pages 38 to 41)

## Page 42

MUMPER

My opinion is that Eudragit NE30D in example 1 is used as -- or is a sustained-release agent that's present at a defined ratio relative to the enteric coating agent and is added at the same time as the enteric coating agent to impart the function as a sustained-release agent.

MR. MUKERJEE: Arlene, it's 11 o'clock. As I indicated, I need five minutes.

MS. CHOW: Why don't we make it a 10-minute break.

MR. MUKERJEE: That's fine.

(Recess taken from 11:00 a.m. to 11:13 a.m.)

BY MS. CHOW:

Q. You didn't answer my question actually before the break so I'm going to ask it again. Example 1 of the '994 patent, is Eudragit NE30D used to release the active ingredient at a predetermined rate in order to maintain a constant or prolonged drug concentration for a specific period of time?

A. I don't have any knowledge of how Eudragit NE30D functions in this specific example. I will say that Eudragit NE30D is taught by the

## Page 43

MUMPER

inventors to be a sustained-release agent and as a matter of function, sustained-release agents are known to prolong or control the rate of drug release.

Q. Would your answer be the same for example 2, example 3, example 4, example 5, example 6, example 7, example 8, and example 9 of the '994 patent?

MR. MUKERJEE: Objection. Dr. Mumper, take as much time as you need to go through each of these examples.

THE WITNESS: And you're asking specifically about the Eudragit NE30D?

BY MS. CHOW:

Q. I'll restate the question. In examples 2 -- so this is the question.

In examples 1 through 9 of the '994 patent, is the Eudragit NE30D being used to release the active ingredient at a predetermined rate in order to maintain a constant or prolonged drug concentration for a specific period of time?

THE WITNESS: I would like the reporter to, if you could read back my answer to the previous question. I think that's what you're

## Page 44

MUMPER

asking me.

(The following was read by the reporter:
"ANSWER: I don't have any knowledge of how Eudragit NE30D functions in this specific example. I will say that Eudragit NE30D is taught by the inventors to be a sustained-release agent and as a matter of function, sustained-release agents are known to prolong or control the rate of drug release.")

THE WITNESS: So my answer, my previous answer would be the same as you asked for examples 2 through 9.

BY MS. CHOW:

Q. So you don't have any knowledge of how Eudragit NE30D is functioning in examples 1 through 9 of the '994 patent, yes?

MR. MUKERJEE: Objection.

THE WITNESS: I don't have knowledge as to how Eudragit NE30D is functioning in the tablets in examples 1 through 9.

BY MS. CHOW:

Q. Okay. Similar question.

In claim 1 of the '994 patent, is the

## Page 45

MUMPER

sustained-release agent used to release the active ingredient at a predetermined rate in order to maintain a constant or prolonged drug concentration for a specific period of time?

A. I don't have any knowledge of whether the sustained-release agent listed in claim 1 is causing the drug in the tablets to be released in a prolonged or sustained manner.

Q. Is it your understanding that claim 1 is not limited to examples 1 through 9 of the '994 patent?

MR. MUKERJEE: Objection, calls for a legal conclusion.

THE WITNESS: Can you restate the question?

BY MS. CHOW:

Q. Is claim 1 of the '994 patent limited to just the examples 1 through 9?

MR. MUKERJEE: Same objection, calls for a legal conclusion.

THE WITNESS: Would you like me to answer?

BY MS. CHOW:

Q. Absolutely.

```
                                    46
 1              MUMPER
 2      A.  My understanding is consistent with the
 3  statement in '994 that the examples are
 4  illustrative but by no means limit the present
 5  invention.
 6      Q.  Now, I'd like to direct your attention
 7  to column 16, lines 37 through -- you know what,
 8  it's roughly around line 40.  The patent states
 9  the coating layer may be constructed by plural
10  layers.
11          Do you see that?
12      A.  I see that.
13      Q.  Is it your understanding that the
14  enteric coating layer of claim 1 can be
15  constructed by plural layers?
16          MR. MUKERJEE:  Objection.
17          THE WITNESS:  My understanding from
18  column 16, line 37, is that the enteric
19  coating layer, there may be more than one.
20  There could be two, there could be three, but
21  that each enteric coating layer must contain
22  both an enteric coating agent and a
23  sustained-release agent together in each
24  layer.
25          MS. CHOW:  Let me mark as Exhibit
```

```
                                    47
 1              MUMPER
 2  Mumper 5 the joint claim construction
 3  statement that was entered into in this case
 4  by the parties.
 5          (Mumper Exhibit 5, joint claim
 6  construction statement, marked for
 7  identification.)
 8  BY MS. CHOW:
 9      Q.  And I'll direct your attention to page
10  11 just to cut to the chase.  Have you seen that
11  document before?
12      A.  I believe I've seen this document
13  before.
14      Q.  All right.  Now, you see there that
15  plaintiffs have a construction for enteric coating
16  layer on top of page 11; do you see that?  I'm
17  going to read it into the record.
18          So plaintiffs' construction for enteric
19  coating layer is the enteric coating layer may be
20  constructed by plural (e.g. 2 or 3) layers.
21          Do you see that?
22      A.  I see the enteric coating layer may be
23  constructed by plural (e.g. 2 or 3) layers.
24      Q.  Is there anything wrong with that
25  construction?
```

```
                                    48
 1              MUMPER
 2          MR. MUKERJEE:  Objection.
 3          THE WITNESS:  What do you mean by
 4  wrong?
 5  BY MS. CHOW:
 6      Q.  Do you disagree with it?  Basically I
 7  don't know if you agree or disagree with it so I
 8  want to know, do you agree or disagree?
 9      A.  I think that that statement, the
10  enteric coating layer may be constructed by plural
11  (e.g. 2 or 3) layers is verbatim from column 16,
12  line 37 and 38, and so it's consistent with '994.
13      Q.  Okay.  So you don't disagree with it,
14  correct?
15          Maybe you didn't hear it.  Strike that
16  question.
17      A.  I was just carefully thinking of my
18  answer.
19      Q.  Oh, you are?  Because I couldn't tell
20  whether you heard or not.
21      A.  You're asking if I disagree or agree
22  with that statement?
23      Q.  You're saying it's consistent with the
24  patent?
25      A.  It's consistent with the patent.
```

```
                                    49
 1              MUMPER
 2      Q.  That's fine.
 3          Let's turn to page -- I think it's up
 4  one, page 8 of Mumper 5, okay?
 5          Now, this is the construction for
 6  enteric coating layer comprising a first component
 7  which is an enteric coating agent and a second
 8  component which is a sustained-release agent.
 9          Now, you see plaintiffs' construction
10  right there?
11      A.  Yes.
12      Q.  It's my understanding that you disagree
13  with plaintiffs' construction for this claim term;
14  is that correct?
15      A.  Yes.
16      Q.  Is there anything fundamentally wrong
17  with plaintiffs' construction?
18          MR. MUKERJEE:  Objection.
19  BY MS. CHOW:
20      Q.  So it's one thing if you disagree with
21  it but I'm asking you if there's anything wrong
22  with it.
23          MR. MUKERJEE:  Objection.
24          THE WITNESS:  I'd like you to clarify
25  the word "wrong" and what do you mean by
```

13 (Pages 46 to 49)

Page 58

MUMPER

any kind?
   MR. MUKERJEE: Objection.
   THE WITNESS: When -- when measuring granule size of a powder, you typically have a span of particles and an average and so you would report the data as an average plus a standard deviation with respect to the span or the breadth of that particle size population. That's different than the error that might be associated with measuring the average particle size and the span of that granule population.
BY MS. CHOW:
   Q. Are you familiar with the USP or the U.S. Pharmacopeia?
   A. I am familiar with the USP.
   Q. What is it?
   A. It is a compendium of industry-accepted guidelines on various aspects related to raw materials, drugs and the testing of those.
   Q. Does the USP set forth the standards for persons of skill in the art of pharmaceutical sciences?
   MR. MUKERJEE: Objection, form.
   THE WITNESS: Can you repeat the

Page 59

MUMPER

question?
BY MS. CHOW:
   Q. Does the USP set forth standards for persons of skill in the pharmaceutical arts?
   A. In my opinion, the USP sets forth a series of guidelines to guide the industry on acceptable specifications and methods to test raw materials, ingredients and drugs.
   Q. Does the USP set forth a series of guidelines to guide the pharmaceutical industry on acceptable specifications and methods in relation to average particle size measurements?
   MR. MUKERJEE: Objection.
   THE WITNESS: That question is a general question to me because what the USP does is it has guidelines on the testing of powders and particle sizes of those powders based on a specific measure -- method of measurement, so there's not a specification for general measurement because each method that's used to measure particle size is dependent on the method being used, the instrument, and all of the parameters associated with the use of that instrument to

Page 60

MUMPER

measure, in this case, average particle diameter.
BY MS. CHOW:
   Q. Do persons of skill in the art turn to the USP for guidelines in relation to average particle size measurements?
   A. In my opinion, people of ordinary skill in the art turn to the USP as a potential source of guidelines to understand industry -- kind of basic minimum industry standards of how one might do that but that in my experience, an assay that might be developed to determine average particle size in a laboratory for research or product purposes, those assays might be more rigorous than the guidelines set out in the USP.
   What the USP intends to do is kind of bring all of the workers in the industry kind of on the same page, per se, as to an accepted practice but it's a minimum standard. It's not a gold standard in my opinion.
   Q. So the USP sets forth a minimum standard for the pharmaceutical industry but not necessarily the gold standard; is that your testimony?

Page 61

MUMPER

   A. My testimony is that in my opinion that the USP sets forward a minimum standard for the testing of various ingredients or products but it doesn't -- it doesn't articulate -- I said gold standard. What I mean is the most rigorous processes that one would employ for the purposes of testing drugs and products for publication or for registration of those products.
   (Mumper Exhibit 6, U.S. Pharmacopeia Chapter 429, marked for identification.)
   MS. CHOW: I've marked as Mumper 6 U.S. Pharmacopeia Chapter 429 entitled Light Diffraction Measurement of Particle Size.
   MR. MUKERJEE: Arlene, for the record, it's a copy of the December 1, 2009 to September 30, 2010 USP; is that correct?
   MS. CHOW: I'll take your representation.
   MR. MUKERJEE: I'm just reading from the top of the document you've marked as Mumper 6.
   MS. CHOW: Okay. The document says what it says.

16 (Pages 58 to 61)

66

MUMPER

particle diameter in '994 could be measured by a number of assays to measure average particle diameter, including laser diffraction, and the HEROS RODOS is just one of the laser diffractometers that could be used in that class.
BY MS. CHOW:
   Q.   Do you agree that USP 429 sets forth a standard of error for measurement of average particle size?
   A.   Can you repeat the question or can you read it back to me?
        (Record read.)
        THE WITNESS:  The question, I just want to be clear, it's general because this specifically is talking about light diffraction.  So your question is specifically related to light diffraction and whether or not it sets forth an accepted standard of error using laser diffraction to measure particle size.
BY MS. CHOW:
   Q.   Okay.
   A.   Is that your question?

67

MUMPER

   Q.   My question was:  Do you agree that USP 429 sets forth a standard of error for measurement of average particle size?
   A.   I am having problems with the question because 429 talks about accepted -- accepted fluxes or deviations around measurements that are specific to why that measurement was done.  So replicates, system suitability, and so it lays it out.  So your question is -- and I should add accuracy and repeatability.
        So your question is very general because 429 speaks to accepted fluxes in those data for those different tests of which laser light diffraction will help you to determine.
   Q.   Would one of skill in the art understand that the average particle size measurement required by claim 1 of the '994 patent would include fluxes or deviations around those measurements?
   A.   My opinion of claim 1 is that the inventors claimed exactly what is stated here, that fine granules having an average particle diameter of 400 microns or less means that those fine granules had an average particle diameter of

68

MUMPER

400 microns or less.
        Now, there could be a flux around that average based on the true distribution of the particles but that the average particle diameter was precisely 400 microns or less.
   Q.   What do you mean when you say there could be a flux around that average based on the true distribution of the particles?  I guess I'm not understanding.  I mean it's your position that the average -- there's basically a hard cutoff of 400 microns for the average particle diameter; is that your testimony?
   A.   My testimony is that you have a true average particle diameter of granules and so the average is the 50 percent volume median diameter as defined by '994, I accept that, and there will be a true distribution of those particles.  They are not all, let's say, 390 or 300.  There's a flux of the true distribution of those particles.
        They could be -- let's say it was 330, they could be a range from 310 to 350 but the average in that example is 330.  That's what I mean by the flux around the true average particle diameter.  It's a different question then to say

69

MUMPER

what is the error associated with the measurement of those particles.
        My position then is with respect to claim 1 is that the inventors stated what they literally meant, the average particle diameter of those fine granules is 400 microns or less.  The single 50 percent weighted volume parameter is always 400 microns or less.
   Q.   So if I had a tablet that had an average particle diameter of 405 microns, let's say, is it your position it would fall outside claim 1?
   A.   It would literally fall outside of claim 1, in my opinion.
   Q.   If I had a tablet that had an average particle diameter of 401 microns, is it your position it would fall outside claim 1?
   A.   If the average particle diameter was 401, it would literally fall out of claim 1 in '994.
   Q.   Is it your understanding that average particle diameter and maximum particle diameter are two distinct concepts?
   A.   My understanding is that average

18 (Pages 66 to 69)

                                                              70
```
 1                    MUMPER
 2   particle diameter and maximum particle diameter
 3   are two different concepts, two different things.
 4       Q.   Now, I want you to look at the patent,
 5   '994 patent.  I want you to compare claim 1 and
 6   claim 7.
 7            Do you see that claim 7 captures the
 8   concept of a maximum particle diameter of 425
 9   microns or less?
10            MR. MUKERJEE:  Objection as to form.
11       You can answer.
12            THE WITNESS:  I believe that claim 7
13       says -- is referring to the particle diameter
14       of the fine granules as practically 425 or
15       less and that what I believe they are
16       referring to is the maximum particle diameter.
17   BY MS. CHOW:
18       Q.   Now, your proposed claim construction
19   for average particle diameter incorporates maximum
20   particle diameter; is that correct?  You can look
21   at the joint claim construction chart for
22   reference if you want.  It's on page 13.
23       A.   Thank you.
24            Yes, that is correct, my proposed claim
25   construction incorporates the maximum particle
```

                                                              71
```
 1                    MUMPER
 2   diameter with the average particle diameter, so
 3   wherein the particle diameter of the fine granules
 4   is 3- to 400 microns or less with a maximum
 5   particle diameter of 425 or less.
 6       Q.   And there's also --
 7       A.   There's another one.
 8       Q.   There's also an earlier -- it's page 2.
 9            So your construction for fine granules
10   having an average particle diameter of 400 microns
11   or less incorporates maximum particle diameter; is
12   that right?
13       A.   Yes, my proposed claim construction
14   states fine granules having an average particle
15   diameter of 400 microns or less with a maximum
16   particle diameter of 425 microns or less.  So both
17   of those are incorporated into the claim
18   construction.
19       Q.   So your claim construction for really
20   claim 1 of the patent incorporates a concept
21   that's already set forth in claim 7; is that
22   right?
23            MR. MUKERJEE:  Objection.
24            THE WITNESS:  I'm not sure I understand
25       the question.  Can you restate it?
```

                                                              72
```
 1                    MUMPER
 2   BY MS. CHOW:
 3       Q.   Claim 7 describes maximum particle
 4   diameter; is that right?  Okay, yes, no?
 5       A.   Yes, that's true.
 6       Q.   When you provided the claim
 7   construction for fine granules having an average
 8   particle diameter of 400 microns or less for claim
 9   1, did you take claim 7 into account?
10       A.   I did take claim 7 into account.  When
11   I constructed the claims, I looked at the term for
12   average particle diameter and I construed it from
13   the teaching of the '994 patent that the maximum
14   particle diameter was inherent in the teachings of
15   '994 with respect to the average particle diameter
16   of 400 micron or less in claim 1, and then I
17   concluded from that that claim 7 was superfluous.
18   It was not necessary, that inherent in claim 1 was
19   the concept of a maximum particle diameter as
20   taught by '994.
21       Q.   Okay.  So it's your position that claim
22   7 was superfluous and not necessary in light of
23   claim 1, correct?
24       A.   My opinion was claim 7 was not
25   necessary in light of my proposed claim
```

                                                              73
```
 1                    MUMPER
 2   construction for claim 1.
 3       Q.   Okay.
 4            Are you familiar with the Journal for
 5   Pharmaceutical Sciences?
 6       A.   Journal of Pharmaceutical Sciences?
 7   I'm familiar --
 8       Q.   I will defer to you on that.
 9       A.   I am familiar with the Journal of
10   Pharmaceutical Sciences.
11       Q.   Is it peer reviewed?
12       A.   Journal of Pharmaceutical Sciences is
13   peer reviewed.
14       Q.   Have you published in it?
15       A.   I have published in the Journal of
16   Pharmaceutical Sciences.
17       Q.   Is it respected?
18       A.   What do you mean by respected?
19       Q.   Do persons of skill in the art rely
20   on -- strike that.
21            Are you familiar with the PQRI or the
22   Product Quality Research Institute?
23       A.   I have heard of the institute and am
24   familiar with the basics of what they do.
25            (Mumper Exhibit 7, article from the
```

Page 98

                    MUMPER

1  
2  thing, right?
3      A.   Non-effervescent excipients and free
4  of organic acids do not mean the same thing to
5  me.
6      Q.   Now, you understand that the claim
7  originally included the phrase "free of organic
8  acids" but that was subsequently dropped by the
9  patentee, right?
10     A.   My understanding from the prosecution
11 history is that the inventors requested
12 reexamination of the patent based on the discovery
13 of 70 to 72 patents that had not previously been
14 disclosed.  And in that analysis, they proposed a
15 reconstruction of their claim that included the
16 term "non-effervescent excipients free of organic
17 acids," and as I recall, the examiner looked at
18 that proposed claim amendment and concluded that
19 there was not sufficient evidence of the term
20 "free of organic acids" in the '632 specifications
21 and struck that.
22         MS. CHOW:  I'm going to mark as Mumper
23     12, U.S. patent 5,047,247.
24         (Mumper Exhibit 12, U.S. patent
25     5,047,247, marked for identification.)

Page 99

                    MUMPER

1  
2  BY MS. CHOW:
3      Q.   Is this familiar to you?
4      A.   I recall this in a general way.
5      Q.   Is USP 5,047,247 an effervescent
6  tablet?
7          MR. MUKERJEE:  Objection.  And
8      Dr. Mumper, take as much time as you need to
9      familiarize yourself with the document.
10 BY MS. CHOW:
11     Q.   Or while you're skimming it, you can
12 look and see whether or not it teaches the use of
13 organic acids.
14     A.   That's a second question because I can
15 answer that one.
16     Q.   All right, answer that.  Go ahead.
17     A.   Column 3, line 29 and 30, preferably
18 citric acid is used as the organic acid.
19     Q.   So this is a piece of prior art that
20 the patentee distinguished over during
21 prosecution, okay?  So just so we're clear, USP
22 '247 does teach the use of organic acids, right?
23         MR. MUKERJEE:  Objection.  Again, take
24     as much time as you need.
25         THE WITNESS:  '247 does utilize in

Page 100

                    MUMPER

1  
2  examples and in the specifications organic
3  acids like citric acid.
4  BY MS. CHOW:
5      Q.   In rendering your opinions, did you
6  study whether or not USP '247 -- strike that.
7          In preparing your expert report, did
8  you assess whether or not the '247 patent
9  disclosed effervescent excipients?
10     A.   Can you repeat that?  I want to make
11 sure I heard that correctly.
12         (Record read.)
13         THE WITNESS:  Yes, in reviewing -- in
14     preparing for my declaration, I considered
15     whether patents in the prosecuting history,
16     including '247, contained effervescent
17     excipients.
18 BY MS. CHOW:
19     Q.   And does the '247 patent teach the use
20 of effervescent excipients?
21         MR. MUKERJEE:  Objection.
22         THE WITNESS:  In my opinion, '247 does
23     teach the use of an effervescent excipient or
24     excipient that is known to be an effervescent
25     excipient in their tablet.

Page 101

                    MUMPER

1  
2  BY MS. CHOW:
3      Q.   Does the '247 patent teach the use of
4  an effervescent acid/base couple?
5      A.   To the best of my knowledge, the '247
6  does not mention the word effervescent.  It does
7  have excipients in the tablet that are known to be
8  effervescent excipients.
9          THE WITNESS:  Can I ask to take a
10     five-minute break?  Is that okay, just a bio
11     break?  I wanted to ask before you ask another
12     question.
13         MS. CHOW:  That's okay.
14         (Recess taken from 2:06 p.m. to
15     2:08 p.m.)
16 BY MS. CHOW:
17     Q.   Keep the '632 in front of you.
18     A.   Okay.
19     Q.   That's Mumper 9.
20         What is gastroresistance?
21     A.   Are you asking for my interpretation of
22 the '632 patent?
23     Q.   No.  I'm just asking you what is your
24 understanding of what gastroresistance is.
25     A.   My understanding of gastroresistance in

Page 102

MUMPER

a general way is, and as it relates to dosage forms, is the ability of the dosage form to protect to some measurable amount an incorporated drug substance from the enzymes and low pH that would otherwise harm either chemically or physically that drug substance.

Q. Does the '632 patent teach gastroresistance?

MR. MUKERJEE: Objection as to form.

BY MS. CHOW:

Q. If you want, I can direct you to some passages.

A. I can answer.

Q. Okay.

A. The '632 patent in column 3, lines 41 through 51 is talking about and teaching a tablet according to this invention that permits or impairs, imparts gastroresistance, and they are referring to the drug.

Q. Does the patent associate gastroresistance with the coating of -- strike that.

Does the patent associate gastroresistance with an enteric coat?

Page 103

MUMPER

MR. MUKERJEE: Objection.

THE WITNESS: In my opinion, '632 utilizes the well-known principle of enteric coating as to impart gastroresistance or to protect an acid sensitive drug from the gastric or stomach environment.

BY MS. CHOW:

Q. And when you say the enteric coat imparts gastroresistance or to protect an acid sensitive drug from the gastric or stomach environment, are you referring to the low pH of the stomach?

A. As I mentioned earlier, gastroresistance refers to -- the word "gastro" refers to the stomach which is known to have high concentration of enzymes and low pH.

Q. So for the '632 patent, the enteric coat helps protect the active ingredient from the low pH of the stomach, correct?

A. Yes.

Q. Is it fair to say the greater the gastroresistance, the lesser the influence of the low pH of the stomach?

A. Can you repeat that question? Or --

Page 104

MUMPER

okay.

Q. Is it fair to say the greater the gastroresistance, the lesser the influence of the low pH of the stomach?

A. Can you clarify that question? The lesser the influence of the pH of the stomach on what?

Q. Oh, I see. Okay.

I'm just trying to get the correlation between gastroresistance and pH. But is it fair to say the greater the gastroresistance, the lesser the influence of the low pH of the stomach on the active ingredient?

A. I would say that if you had granules, multiparticulate granules that are coated with an enteric coating and you could measure acid-resistance, let's say by doing an acid-resistance test, that you would expect a granule that had, let's say, more of a coating or a sufficient coating and you showed that it was more resistant, that the drug was more stable in those granules, a drug that was acid sensitive, that that would correlate, or the converse of that is if you had a granule that had an instance

Page 105

MUMPER

sufficient or incomplete coating and you measured more instability due to the low pH of the stomach, so I think that's consistent and I think that's a fair conclusion.

Q. Does gastroresistance means that there is reduced pH influence in the digestive track?

MR. MUKERJEE: Objection.

THE WITNESS: No. I think in the example that I just gave in answer to my last question is that you have a measurable cause and effect. And I think what's missing in your question is being able to measure and correlate the two.

BY MS. CHOW:

Q. So how would you phrase it, if basically the flaw is in my question?

A. I think you're getting at the claim construction and how I concluded that that claim was indefinite, that term was indefinite, and my conclusion is largely based on that you need to be able to measure where you're starting from and where you're going, and so just to have a general statement that they are correlated I think is indefinite.

27 (Pages 102 to 105)

122

MUMPER

BY MS. CHOW:
Q. Okay. Let's isolate the term. Let's just talk about orally disintegrable so you'll be more comfortable with the question.
   Let's say I have a tablet that disintegrates only in water but not in the mouth. Is that an orally disintegrable tablet?
A. I hear your question and you're asking me a tablet that will only disintegrate in water? Okay. So you have a glass of water. The tablet will only disintegrate in water. That was your words. So that means literally it cannot disintegrate in saliva, only in water, so an orally disintegrable tablet means one that is capable of disintegrating in water or in saliva. So based on the way you asked me that question, I would say no, because you said it only disintegrates in water, which means it's not capable of disintegrating in saliva so it doesn't meet that claim definition.
Q. Isn't your definition really that orally disintegrable tablet means a tablet that disintegrates in both water and saliva?
   MR. MUKERJEE: Objection.

123

MUMPER

BY MS. CHOW:
Q. You used the word "or" in our conversation but I'm getting the sense it might be "and" so can you just clarify for me?
   MR. MUKERJEE: Objection, mischaracterizes the witness's testimony.
   THE WITNESS: My position about the term disintegrable tablet is consistent in my opinion with what '994 teaches about an orally disintegrable tablet, that it can be disintegrated in the mouth with very little water and in the presence of saliva or it may be administered dissolved or disintegrated with water. My definition of disintegrable tablet is in my opinion completely in agreement with what '994 teaches.
BY MS. CHOW:
Q. I'm just trying to understand kind of the boundaries of your claim construction, and it seems to me that you're saying, but you can correct me if I'm wrong, that an orally disintegrable tablet does not include a tablet that can only be disintegrated in water, right?
   THE WITNESS: Can you read the question

124

MUMPER

back to me?
   (Record read.)
   THE WITNESS: Maybe the way the question is phrased I'm having problems with.
   Again, my position in terms of claim construction on what an orally disintegrable tablet is is completely consistent with column 17, line '61 through '66, where it says that it may be dissolved or disintegrated with water and with saliva.
   So in response to your question, this tablet can -- is capable of disintegrating in the oral cavity and per the teaching of '994, the tablet may also be administered, dissolved or disintegrated with water. So '994, again what I am concluding is that they are teaching a tablet that can do either, not one or the other, but either and that's my position and it's consistent with the teaching of '994.
BY MS. CHOW:
Q. I guess it seems to me there's a distinction between two concepts. One concept is what makes an orally disintegrable tablet an orally disintegrable tablet, and there's a second

125

MUMPER

concept which is how that tablet can be administered. Do you understand what I'm trying to say? I'm trying to understand in terms of your fundamental definition for orally disintegrable tablet. If there's a distinction between what in essence makes an orally disintegrable tablet an orally disintegrable tablet versus the fact that there may or may not be various methods of administering that orally disintegrable tablet. That's what I'm trying to understand.
   It's hard to ask these questions, hard for you to answer but that's the root of my questioning, okay?
A. And I was asked to opine about the definitions of terms in the '994 patent. And one of those terms that I very carefully considered is the term disintegrable and what that means. And again, that is an adjective that means it's capable of disintegrating.
   And when the '994 patent was applied for, mid to late '90s, ODTs, orally disintegrating tablet, that's a verb, that it must be a disintegrating tablet. The inventors chose a word that has a literal English meaning and that is an

32 (Pages 122 to 125)

                                                    126
                    MUMPER
adjective meaning that it's capable with, and I,
in my opinion, the inventors were very careful in
using the word disintegrable instead of
disintegrating, and the reason I think in my
opinion that they use the word disintegrable
meaning capable of is they were explicitly
teaching different administration methods and
envisioned that their tablet that was capable of
disintegrating could be administered either
directly in the mouth or added to a tablet for
dissolution and disintegration and then that would
be swallowed.
    Q.   So if a tablet disintegrates in water
outside of the mouth and then is swallowed by the
patient, that falls under your construction of
orally disintegrable tablet, yes?
    A.   You're asking that question in a very
general way.  I was asked to opine about '994 and
what the term orally disintegrable tablet means.
With respect to '994, if that tablet was placed in
water and then swallowed, consistent with the
teaching of '994 and their claim, I would agree
that's an orally disintegrable tablet.
    Q.   So now let me push it a little bit

                                                    127
                    MUMPER
further.
         If a tablet disintegrates in water
outside of the mouth and then is swallowed by the
patient but that same tablet cannot disintegrate
inside the mouth, okay, does that tablet fall
under your construction of orally disintegrable
tablet as set forth in the '994?
    A.   That now falls outside as required by
the '994 patent that when they talk about the
tablet, they mean a specific tablet that has the
properties of being able to -- it's capable of
dissolving or disintegrating with little water and
in the presence of saliva in the cavity, and it
says also the tablet.  The same tablet may be
administered dissolved or disintegrated with
water.
         So my answer when you asked the
question so if you have a tablet that is dissolved
in water and swallowed but that same tablet cannot
disintegrate in the mouth, that falls outside.
    Q.   So do you agree that it is a defining
characteristic of an orally disintegrable tablet
that it must be able to disintegrate inside the
mouth?

                                                    128
                    MUMPER
    A.   So you're -- just so I understand you,
it must disintegrate in the mouth, the claim -- my
position is that it must be capable of, that an
orally disintegrating tablet could be applied --
I'm sorry, an orally disintegrable tablet may be
dosed by other routes of administration but it
must be capable.  You asked the question it has
to.
    Q.   So is it a defining characteristic of
an orally disintegrable tablet that it must be
capable of disintegrating inside the mouth?
    A.   Per '994 teaching, specifically claim
1, an orally disintegrable tablet is a tablet
capable of disintegrating in the mouth.  It
doesn't explicitly have to but it has to be
capable of.
    Q.   For the '632, does your construction
for orally disintegrable as set forth -- sorry,
strike that.
         Does your construction for
disintegrable for the '994 patent apply equally to
the term disintegratable for the '632 patent?
         MR. MUKERJEE:  Objection, asked and
answered.

                                                    129
                    MUMPER
         THE WITNESS:  In looking at '632, claim
1, a rapidly disintegratable tablet, as I have
said, that means that it's capable of
disintegrating.  It's intended for oral
administration and it specifies disintegration
in the buccal cavity.  So it's basically as
I -- in my opinion, what claim 1 is doing in
the first sentence is saying that you have a
rapidly -- you have a tablet that's capable of
disintegrating for oral administration, and it
specifies it must disintegrate in the buccal
cavity.
         So what's different in '632, and I
think this is completely in line with my
position, is that it's specifying exactly
where the tablet must disintegrate.  And it's
going a step further than just saying it's
capable.  Now it's saying it has to
disintegrate in the buccal cavity.  So where
the '994 patent said it's capable of
disintegrating in these different places,
claim 1 of the '632 is now being literally
very specific.  A tablet that's capable of
disintegrating must be given orally and

138

```
 1                 MUMPER
 2   ordinary skill in the art of the '994 and '632
 3   should have more education and more work
 4   experience than what was set forth in the
 5   omeprazole court decision?
 6         MR. MUKERJEE:  Objection.
 7         THE WITNESS:  That's not exactly what
 8      I'm saying.  I didn't say more education.
 9      Just to be clear, I'm saying that the person
10      must have a higher degree.  You could have
11      possibly someone with 10 undergraduate
12      degrees.  That's a lot of education, perhaps
13      more time than one Ph.D.
14         What I am saying is that Dr. Byrn's
15      definition of someone with ordinary skill I
16      believe is incorrect in my experience and his
17      support for that definition of somebody with
18      ordinary skill is flawed.
19   BY MS. CHOW:
20      Q.   Prior to this litigation, were you
21   familiar with Dr. Byrn?  Had you heard his name
22   before, see his publications?
23      A.   Yes, I know Dr. Byrn.
24      Q.   Do you have any understanding as to his
25   reputation?
```

139

```
 1                 MUMPER
 2      A.   Yes, I have my personal -- I have a
 3   personal view on his reputation.  I don't know how
 4   others view his reputation.
 5      Q.   And what is your personal view?
 6      A.   Thank you.
 7      Q.   How could I not follow up on that
 8   answer?
 9      A.   I've known Dr. Byrn for 20, 25 years.
10   Faculty at Purdue.  I've listened to his lectures
11   before.  He came down to the University of
12   Kentucky and gave a lecture.  He was an expert
13   witness on the Watson Cephalon case on the third
14   patent, the one that I was not an expert witness
15   on.
16         My opinion of Dr. Byrn is that he is an
17   expert in -- and I highly regard him in the area
18   of solid state chemistry, crystalline habits of
19   drugs and powders, polymorphism, so aspects
20   related to solid state stability and
21   characterization of those materials, and his CV
22   lists 160 publications.  I'm just estimating that
23   90 percent, 95 percent deal with what I just
24   described and so he's highly regarded in that
25   area.
```

140

```
 1                 MUMPER
 2         I do not know him to be a person with
 3   the reputation in ODTs.  He -- his curriculum
 4   vitae does not document work with ODTs.  I
 5   understand that he claims to have submitted
 6   proposals on ODTs and that in his laboratory or
 7   laboratories, he's working on ODTs.  That is not
 8   indicated, at least to me, on his curriculum
 9   vitae.
10      Q.   What is your area of expertise?
11      A.   My area of expertise is in the area of
12   drug delivery, advanced drug delivery systems.  I
13   have pursued various types of delivery systems,
14   almost every route of administration, for 20 or 25
15   years.  I teach a course on dosage forms.  I
16   taught it for 13 years to pharmacy students and we
17   talked about ODTs and sustained-release oral
18   systems, and as I told you earlier, I was a expert
19   witness representing Watson in the Fentora case,
20   which is an ODT.
21      Q.   Does your CV detail any work that you
22   have done on ODTs?
23      A.   I do not think that my CV has the term
24   ODT.
25      Q.   That doesn't answer my question.
```

141

```
 1                 MUMPER
 2         Does your CV describe any prior work by
 3   you on ODTs?
 4      A.   I think I did answer the question.  It
 5   doesn't -- it doesn't mention the term orally
 6   disintegrating tablet.
 7         MS. CHOW:  Okay.  Let's take a break.
 8      I just want to make sure I don't have any
 9      follow-up questions.
10         (Recess taken from 4:00 p.m. to
11      4:14 p.m.)
12         MS. CHOW:  I have no further questions
13      for you.
14         MR. MUKERJEE:  Mylan has no questions.
15         (Time noted:  4:14 p.m.)


17      _____
18         DR. RUSSELL MUMPER

20   Subscribed and sworn to before me
21   this _____ day of _____, 2012.
22
23   _____
24         Notary Public
25
```

36 (Pages 138 to 141)