# EXHIBIT 32

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW JERSEY

_____

TAKEDA PHARMACEUTICAL COMPANY LIMITED, TAKEDA )
PHARMACEUTICALS NORTH AMERICA, INC., TAKEDA  )
PHARMACEUTICALS LLC, TAKEDA PHARMACEUTICALS  )
AMERICA, INC., and ETHYPHARM, S.A.           ) Civil Action No.
       Plaintiff,                            ) 3:11-CV-02506-JAP-DEA
  vs.                                          )
MYLAN PHARMACEUTICALS INC.,                  )
       Defendant.                            )
_____)


DEPOSITION OF DR. STEPHEN R. BYRN


TRANSCRIPT of the stenographic notes of the proceedings in the above-entitled matter, as taken by and before TAB PREWETT, a Registered Professional Reporter, a Certified LiveNote Reporter, and Notary Public, held at the Offices of HOGAN LOVELLS US LLP, 875 Third Avenue, New York, New York  10022, on Friday, June 8, 2012, commencing at 10 a.m.

Page 150

1  personal information, what a person skilled in
2  the art knows.
3       Q.   But you have presented no
4  documentary proof to support your claim?
5            MS. CHOW:  Objection to the form.
6       A.   I mean, I don't know.  There
7  weren't any -- people just knew this.  There
8  weren't any publications.  It was just known.
9       Q.   And so then the -- also, the USP
10 that you have attached to your declaration --
11 well, we'll get to that in a second -- it's not
12 specific to any particular device, right?
13      A.   Correct.  That's because of the --
14 one thing that we are missing here is the
15 definitions of what "precision" and "error" is.
16 There are really four levels of precision that
17 one deals with when they do particle size.  And
18 you need to know and understand those in order
19 to interpret the claims and the data.
20      Q.   Okay.  Now, the claim is not
21 limited in terms of how you measure particle
22 size.  You can measure it using any other

Page 151

1  technique, including laser diffraction, right?
2       A.   Correct.
3       Q.   Okay.  But your construction is
4  dependent upon the standard deviation of laser
5  diffraction.  So how do you reconcile the two, a
6  claim that is not limited to the way you measure
7  it versus construing the term limited to a way
8  it's measured?
9            MS. CHOW:  Objection to the form.
10      A.   I wanted to do -- be conservative
11 and give a number that was a low number, a
12 conservative number, because of claim
13 construction and because it's a legal issue.  So
14 I took a low number.  Probably, in reality, it's
15 slightly higher than 10 percent, but that's how
16 I -- that was my approach.
17      Q.   So you're correlating -- with all
18 of the other methods of measuring particle size,
19 you are correlating the laser diffraction to all
20 of those other methods?
21           MS. CHOW:  Objection to the form.
22      A.   No, I am saying that, based on my

Page 152

1  experience of skill in the art, that, when a
2  person skilled in the art reads the number,
3  400 microns they think conservatively plus or
4  minus 10 percent and, you know, there are --
5       Q.   I'm sorry --
6       A.   -- they think conservatively
7  really.  I can just stop there.
8       Q.   All right.  Let me just give you
9  what is marked as D 27.
10           (Exhibit No. D 27, Excerpt from
11 Physical Pharmacy, is marked by the reporter for
12 identification.)
13      Q.   Dr. Byrn, where I am confused is
14 that you are applying a USP -- the portion of
15 the USP describing the standard deviation for
16 laser diffraction.  And am I correct you are
17 applying that across the board to every other
18 type of measurement that is being used to
19 determine particle size that is out there?  Am I
20 correct about that?
21           MS. CHOW:  Objection to the form.
22      A.   No.  What I am saying -- I am not

Page 153

1  applying that.  I am saying a person skilled in
2  the art reading "400" would read "plus or minus
3  10 percent" conservatively.
4       Q.   Regardless of what device you used
5  to measure it?
6            MS. CHOW:  Objection to the form.
7       Q.   Is that your testimony?
8       A.   Well, when you read a patent the
9  way I approached it or my analysis, I said a
10 person skilled in the art is going to read this,
11 and they are going to want to figure out how to
12 make the measurement to be -- whether they're
13 within or without the patent.
14           And so they would read this, and
15 they would say it can be measured by laser
16 diffraction; but it could also be measured by
17 other means.  And then we have the number,
18 400 microns.
19           So that means to me, in my opinion,
20 a person skilled in the art reading this would
21 say that it's 400 plus or minus 10 percent.  And
22 I think that's a conservative number.

Page 154

1  Q. And that's regardless of the means
2  in which you measure the particle size?
3      MS. CHOW: Objection to the form.
4  A. Well, I didn't ignore the means. I
5  just said, regardless, they would look at all of
6  these options, and they would realize that it's
7  plus or minus 10 percent as a reasonable number
8  and a proper claim construction for that number.
9  And the court -- the court already agreed with
10 me.
11 Q. I understand that. We are going to
12 have -- we'll have a different hearing, and
13 perhaps we have a different approach.
14 A. Okay.
15 Q. But you realize that the only
16 documentation you presented to substantiate the
17 plus or minus 10 percent was a document that was
18 dated after the filing date, and was specific
19 only to laser diffraction, correct?
20     MS. CHOW: Objection to the form.
21 Asked and answered.
22 Q. And there is nothing in that

Page 155

1  document suggesting -- indicating otherwise that
2  that plus or minus 10 percent would apply to any
3  other means of measuring particle size
4  distribution; isn't that correct?
5      MS. CHOW: Objection to the form.
6  Asked and answered.
7      MR. PARKER: It's not asked and
8  answered.
9  A. Although all that's correct, as I
10 explained, I -- my analysis of the claim was
11 based on my experience. And then the plus or
12 minus 10 percent is a conservative number that I
13 put on it that agrees with the USP. But I think
14 it's a conservative number for the time that
15 that was.
16     Another point is there are four
17 types of error we are dealing with it. So the
18 Helos Rodos error is the smallest, by far. The
19 other three are much bigger. And those -- you
20 know, I use those in my analysis.
21 Q. What other types of errors are you
22 talking about?

Page 156

1  A. So if you look in the Snorek paper,
2  it's pretty well-explained there. And it's also
3  explained -- I think it's best explained in the
4  Snorek paper. There is --
5      MS. CHOW: Has that been marked?
6  A. If you can hand me the Snorek
7  paper, I can go through it.
8  Q. I will do that.
9  A. That would be a good way for me to
10 explain it because I think we are getting mixed
11 up on what the error numbers are out there and
12 what the meaning of them are.
13 Q. By the way, I am handing the
14 witness what has been marked as D 28, which is
15 the -- I think we all believe is the Snorek
16 reference.
17     (Exhibit No. D 28, Snorek
18 Reference, is marked by the reporter for
19 identification.)
20 Q. Also, for the sake of completeness,
21 I will hand you what has been marked as D 29,
22 which is the portion of the USP that I believe

Page 157

1  is part of your declaration.
2      Let me find a place to put this.
3      (Exhibit No. D 29, Portion of USP
4  that is part of Dr. Byrn's Declaration, is
5  marked by the reporter for identification.)
6  Q. But just for some foundation, I
7  think this will help.
8      On Exhibit D 27, Dr. Byrn, you will
9  -- it's an excerpt from Physical Pharmacy; and
10 the pages reveal different means of measuring
11 particle size distribution. Do you see that --
12 which includes -- correct me if I'm wrong --
13 optical microscopy, sieving, sedimentation --
14 and, yes, it includes at least those three means
15 that I'm aware of. If I am wrong, you can
16 correct me.
17 A. No, correct.
18     And these methods, these three are
19 wider errors than laser diffraction.
20 Q. Even sieving?
21 A. Yes. Sure. Because consider you
22 have a needle particle, and you have some round

Page 158

1  particles.  The round particles will fall
2  through.  The needle won't.  And you will get a
3  -- a distortion in the particle size.
4         So sieving is not considered an
5  accurate method, and it wouldn't work for small
6  particles, either like cement, like the -- like
7  this project, you couldn't even sieve.  You
8  couldn't come close.
9      Q.   You realize in the '994
10 specification that sieving is the method that
11 they -- that they ended up using?
12        MS. CHOW:  Objection to the form.
13     A.   Well, they just say, for example,
14 Helos Rodos.  I think they use some sieving,
15 also.  But I think the errors of sieving are
16 larger than 10 percent, in my experience.
17     Q.   So, again, I am just trying to be
18 clear now.  Your position is 400 microns or less
19 plus or minus 10 percent, as we just talked
20 about, is based on the information, at least in
21 part, what's in the USP as it concerned laser
22 diffraction?

Page 159

1         MS. CHOW:  Objection to the form.
2      A.   No.  In my plus or minus
3  10 percent, my analysis is based on my own
4  experience.
5      Q.   So your plus or minus 10 percent --
6  I didn't know this; this is the first time I am
7  hearing this is all encompassing -- it
8  encompasses all the methods of measuring?
9      A.   And it's a conservative number.
10     Q.   That's your position?
11     A.   That's my position.
12     Q.   Okay.
13     A.   And I would further add that,
14 generally, laser diffraction is the best method,
15 the most precise method.  So the numbers that
16 Snorek's talking about, and USP, laser
17 diffraction are the numbers that are most
18 precise.  So other methods -- and that's one of
19 the reasons the USP has focused in recent years
20 on the laser diffraction.
21     Q.   Are you aware of any published
22 information that would contradict the

Page 160

1  information that is provided in the Helos Rodos
2  materials with respect to standard deviation?
3         I understand your opinions and
4  experience.  But are you aware of any published
5  information which actually went out and took on
6  the task of actually seeing how precise this
7  information is or can be?
8         MS. CHOW:  Objection to the form.
9      A.   Yes.  That's the -- well, the --
10     Q.   Where can I find that information?
11     A.   Okay, it's NIST -- it's a document
12 called capital N-I-S-T-I-R, all capital letters,
13 6883, is one document.  And the reason I found
14 that document is that it's on cement.  I don't
15 think cement is a proper comparison to drugs.
16        So on the face of this, I don't
17 think it's the right way to do it.  But if you
18 look at that document, what they did is they
19 took four or five samples of cement, the
20 National Institute of Standards.  They sent them
21 to 25 labs, who ran laser diffraction particle
22 size, not just on a Helos Rodos, but bigger,

Page 161

1  wider still, and measured the average and the
2  standard deviation.  And when you look at the
3  data, some of it is as high -- the deviation is
4  as high as 65 percent, not 10 percent, but
5  65 percent.
6         So that's only with cement, and
7  it's only on laser diffraction.
8         You have other data in those things
9  on other measurements.  So that alone tells me
10 that this isn't right, and it's not -- it was
11 known that this is not right.  This isn't the
12 precision of the method.  This is -- and I am
13 going to get to that -- I am going to get to the
14 errors.  If you want me to get to the errors, I
15 will explain why it isn't the right way to do
16 it.
17        You want me to keep going, or you
18 want to ask me a question?
19     Q.   No, I want to stop there.  I am
20 going to get to that.
21        This document -- is this document
22 attached to your declaration?

Page 162

1  A. No, I found it after I reviewed
2  Dr. Mumper's declaration and was -- saw that he
3  was talking about cement. And I said, "Well,
4  what is out there about cement," because, as I
5  said, I wouldn't have used cement when I wrote
6  my declaration.
7  Q. Now, was this dated prior to 1999?
8  A. I don't remember the date. I think
9  it's more like 2000. It could be '99. It could
10 be -- I don't remember the date. But there's
11 NIST -- there are other NIST measurements going
12 on in that time frame.
13 Q. But isn't the use of cement -- I
14 mean, that's more or less -- it's like a control
15 standard; isn't it?
16 A. Well, it's a lot more precise than
17 drugs. The numbers you get from cement --
18 especially if you sit at the instrument company
19 and measure it a few hundred times, the numbers
20 you get are a lot more precise than you would
21 for a drug.
22      I'm going to explain that if you --

Page 163

1  maybe I should just go ahead so you see what I
2  am talking about.
3  Q. Well, why don't you try -- if you
4  want, try to explain it.
5  A. All right. I can try to do it
6  briefly. If you turn to page 1460 of Snorek --
7  pardon me, 1462, in the bottom right-hand
8  corner, starting there and going over to 1463 in
9  the first column, she lists three -- under
10 "Validation," she lists three ways to figure out
11 error. And in the first one is where the
12 10 percent comes from.
13      The first one, precision
14 repeatability. So that's the repeatability of a
15 measurement. The precision of a set of
16 measurements should be obtained using one
17 analyst conducting the method as written. And
18 then she goes over the method. The measurement
19 should be made in a single lab on a single
20 apparatus. And then the next bullet, from one
21 lot obtain replicant measurements.
22      So you take one lot. You take

Page 164

1  replicant measurements. And you determine the
2  average and the standard deviation. It's
3  10 percent. That's where the 10 percent number
4  is.
5       This measurement that these guys
6  are doing is the instrument error on one sample
7  of one lot submitted many, many times. It's
8  smaller than this number one method.
9  Q. Much smaller.
10 A. Much smaller. Because it should
11 be, because you are just putting the same thing
12 in every time. If the instrument doesn't get
13 the right answer and you just repeatedly put the
14 same thing in, you have got serious problems.
15      So -- but this is not the error, in
16 my opinion, that the patent is talking about.
17      If we go to "Intermediate
18 precision," the next bullet, the measurement
19 should be made in the same lab on different days
20 and on more than one instrument.
21      So now we are doing more than one
22 instrument. And then if you go down to

Page 165

1  reproducibility, it is a precision of the test
2  results made by analysis of same samples under a
3  variety of conditions. So there's levels of
4  error.
5       What this is is the most precise,
6  really low. I actually took the next most
7  precise and used it. But there are two higher
8  than that. I don't think it'S indefinite. I
9  don't think the patent is indefinite. But I
10 think that the 10 percent is conservative based
11 on this. And I don't think this is a reliable
12 thing.
13 Q. And you -- well, you said basically
14 the error in the patent is talking about.
15 A. Well, I don't mean the error in the
16 patent. I mean the error of the plus or minus
17 10 percent that a person skilled in the art. I
18 think that's conservative.
19 Q. So based on what you have described
20 of what was going on prior to when this USP
21 criteria came out, you are saying the standard
22 of error was pretty large, or it was, as you put

Page 174

1  Snorek is talking about.
2  Q. Forget about Snorek for a second,
3  please. I will go to that in minute.
4  On the USP, we are not talking
5  about -- when it talks about "replicates," we
6  are not talking about instrument precision. We
7  are simply talking about, you get a sample; you
8  want to report that measurement; and in order to
9  show that it's at least accurate under this
10  criteria, you would have to measure that same
11  sample three times. And then you look to see --
12  you take your central value. And then from
13  there, you determine whether you have variation
14  of 10 percent.
15  MS. CHOW: Objection to the form.
16  A. Not the -- not the same sample.
17  Q. Where is it -- okay.
18  A. At least three different
19  representing samples from the same batch.
20  Q. The same batch. I'm sorry. I
21  misspoke.
22  You take the same batch, but you

Page 175

1  are measuring three samples of the same batch?
2  A. You take three different samples
3  out and run them -- and prepare them and run
4  them.
5  Q. I understand that.
6  A. That's a lot different from what
7  Helos Rodos did.
8  Q. Let me back up, though.
9  It's a lot -- what you are saying
10  here, I just want to be clear. We are not
11  talking about instrument precision where it says
12  "replicates." We are talking about the
13  precision of the actual measurement being done.
14  Do you agree with that?
15  MS. CHOW: Objection to the form.
16  A. I agree with that. And I think
17  that's what the patent is talking about. The
18  patent -- it makes little difference to a person
19  skilled in the art what the instrument precision
20  is. They are trying to figure out whether or
21  not a number is within or outside the patent, so
22  they are not worried about the instrument

Page 176

1  precision. They are worried about the
2  repeatability, or even maybe more the higher
3  level error problems like the intermediate
4  precision, which is the next level up.
5  So there, the instrument precision
6  has little to do with what the patent is talking
7  about.
8  Q. So when they come up with 400
9  microns or less -- well, if you look at the
10  values that they have in the '994 patent, in
11  examples 4 through 9, am I -- is one of ordinary
12  skill in the art to assume that is a plus or
13  minus 10 percent value?
14  A. Sure. Absolutely.
15  Q. So -- but you have no idea back
16  then because there was no criteria whether or
17  not it was either the middle value, whether it
18  was -- it was basically from the same batch
19  measured three times; there is no indication
20  that that was done in the patent.
21  MS. CHOW: Objection to the form.
22  A. Well, I am just saying that,

Page 177

1  according to my analysis and the way you would
2  report the data and if I got a paper to review,
3  all that put together, that, when you put a
4  number in there, my whole analysis was plus or
5  minus 10 percent. And that is a conservative
6  number.
7  Q. But you are speculating. You are
8  assuming that, based upon a document that is
9  filed well after the filing that -- published
10  after the filing date, which requires that you
11  take three samples from a single batch and do
12  your analysis to see what the variation is, that
13  that was somehow applied in the context of this
14  patent. And you have no proof of that.
15  MS. CHOW: Objection to the form.
16  A. That's why I use a conservative
17  number. That's why I was 10 percent. I didn't
18  want to speculate closer to what I think the
19  real numbers are. I just used 10 percent
20  because I thought that was a conservative
21  number.
22  Q. So one of ordinary skill in the art

Page 202

1    (A break is taken.)
2    CONTINUED DIRECT EXAMINATION
3    BY MR. PARKER:
4        Q.   Dr. Byrn, a while ago we talked
5    about cushioning. You have already described
6    it, but let me ask a question:
7            How would you test for cushioning?
8            MS. CHOW: Objection to the form.
9        A.   I think the way Dr. Shimizu did was
10   fine. You make tablets and then do those
11   experiments he did.
12       Q.   You look at the hardness?
13       A.   No, acid resistance, and also
14   release. Just -- yeah, I am trying to find
15   exactly --
16       Q.   Take your time.
17       A.   -- what exhibit it is.
18           MS. CHOW: Are you looking for
19   Dr. Shimizu?
20           THE WITNESS: Yes, what exhibit is
21   that?
22           MR. PARKER: It should be 17.

Page 203

1            THE WITNESS: Here it is, remaining
2    ratio.
3        Q.   Okay. How was that -- that was
4    calculated how? How was that calculated?
5        A.   The content of the drug -- there
6    are three things he measured: hardness, acid
7    resistance, and remaining ratio. And there it's
8    described that the "remaining ratio" is "a
9    content of the drug in the collected fine
10   granules after the dissolution test for one
11   hour."
12       Q.   Okay. So there are three factors:
13   the hardness, acid resistance, and remaining
14   ratio. Then he has a conclusion, "not more than
15   10 percent." Can you just explain what you
16   understood that to mean?
17       A.   Sorry, I didn't catch that one,
18   that question.
19       Q.   Okay. My question you mean?
20       A.   Yes.
21       Q.   So in this -- since you have the
22   declaration in front of you, he mentioned in

Page 204

1    conclusions "not more than 10 percent." Do you
2    see that? He has it in quotes.
3        He says:
4            "Acid resistance defined in USP
5    24" -- and it goes on -- "not more than
6    10 percent."
7            Can you just explain what that --
8    what that means to you?
9        A.   I would have to check that. I
10   mean, what I was looking at is the -- it's about
11   half -- example B is about half as sensitive to
12   acid as example A. I'm not sure what the "not
13   more than 10 percent" is. I would have to look
14   at that USP test.
15       Q.   As far as going back to cushioning,
16   as you stated in your declaration, I mean, a
17   reason to expect when you -- strike that.
18           I just want to turn to now the --
19   go to Claim 1 of the '994 patent, that portion
20   of the claim that refers to orally disintegrable
21   tablets. Then there is a phrase, "wherein said
22   tablet is orally disintegrable."

Page 205

1            Do you recall -- did you take a
2    position on those claim terms in your
3    declaration?
4        A.   I don't recall that I did.
5        Q.   Do you recall that Dr. Mumper took
6    the position that those phrases, where he
7    referred to "a tablet that is capable of
8    disintegrating either in the mouth with saliva
9    or water and then swallowed."
10       A.   Yes.
11       Q.   Okay. And do you agree or disagree
12   with that interpretation?
13       A.   I disagreed.
14       Q.   Okay. And what is the basis of
15   your disagreement?
16       A.   Well, one, that it's clearly -- I
17   think it's clearly in the mouth. One is in the
18   abstract. It says "oral cavity" in the '994
19   abstract.
20       Q.   So you are looking to the abstract
21   as part of your basis for construing that claim
22   term?

Page 206

1  A.  As part of the basis.
2  Q.  Anything else?
3  A.  Yes, there are places, if I can --
4  on column 12, line 39, it says that:
5      "Orally disintegrable tablet of the
6  present invention exhibits fast disintegrability
7  or dissolubility in the oral cavity and also an
8  appropriate strength of preparation."
9  Q.  Okay.  That's column 12, you said,
10 line 37?
11 A.  Line 38 or 39.  It's 39, sorry.
12 39, 40, and 41.
13 Q.  Okay.  Anything else at this time?
14 A.  The '632 -- are we just confined to
15 the '994?
16 Q.  Yes.
17 A.  Okay.
18 Q.  So if I can just direct your
19 attention to column 17, line --
20 A.  There are probably others that I
21 didn't find.
22 Q.  Okay.  But if I can just direct

Page 207

1  your attention -- and if there's something else,
2  you can just call that out.  But if I can just
3  direct your attention to column 17, line 56 --
4  or 57, I'm sorry, all the way down to the end.
5      And, quote:
6      "A solid pharmaceutical preparation
7  comprising the fine granules of the invention as
8  used for an oral disintegrable tablet can be
9  administered without water or together with
10 water."
11     Do you see that?
12 A.  I see that.
13 Q.  Okay.  Now, the "fine granules of
14 the invention," that is -- would you agree it's
15 a reference to the four micrometers or less,
16 microns or less?
17     MS. CHOW:  Objection to the form.
18 A.  The 400 --
19 Q.  Right.
20 A.  -- plus or minus 10 percent microns
21 or less.
22 Q.  And then it also states that it

Page 208

1  could be administered without water.  And that
2  would --
3  A.  Well, that would be -- to me,
4  that's just putting it in the mouth.
5  Q.  That's right.  If it's together
6  with water, that would include with water,
7  correct?
8  A.  Well, that's what it says.  But it
9  defined "orally disintegrable tablet" as in the
10 oral cavity.  So I mean, there, I just look at
11 this -- this isn't defining the tablet.  It's
12 just saying that you can also administer without
13 water.
14 Q.  Okay.
15 A.  But the defined characteristic is
16 dissolubility and disintegrability in the oral
17 cavity.
18 Q.  Are you now back on column 12?
19 A.  Yes.
20 Q.  Again, I know it's tough to -- just
21 the line number, where is that again?
22 A.  39, 40, and 41.

Page 209

1      So this doesn't change my opinion
2  of what that definition means.
3  Q.  It says that it "exhibits fast
4  disintegrability or dissolubility in the oral
5  cavity," and it goes on.
6  A.  But I mean, it's talking about the
7  mouth.
8  Q.  Right.
9  A.  No matter what, it's talking about
10 the mouth.
11 Q.  Right.  Would you agree, though, in
12 column 17 and even down below that, it's talking
13 inside and outside of the mouth?
14     MS. CHOW:  Objection to the form.
15 Q.  17, lines 56 down to 67.
16 A.  To line, which 67?  6-7?
17 Q.  Yes.
18 A.  Well, I mean, it's almost what I
19 would call an off-label use.  It's not the main
20 use.  It's not the defining use.  I don't look
21 at this as -- I am not even sure, you know, how
22 to react further other than to me the defining