# EXHIBIT 35

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW JERSEY

TAKEDA PHARMACEUTICAL COMPANY LIMITED, TAKEDA PHARMACEUTICALS NORTH AMERICA, INC., TAKEDA PHARMACEUTICALS LLC, TAKEDA PHARMACEUTICALS AMERICA, INC., and ETHYPHARM, S.A.

Plaintiff,

vs.

MYLAN PHARMACEUTICALS INC.,

Defendant.

Civil Action No. 3:11-CV-02506-JAP-DEA

DEPOSITION OF DR. STEPHEN R. BYRN

TRANSCRIPT of the stenographic notes of the proceedings in the above-entitled matter, as taken by and before TAB PREWETT, a Registered Professional Reporter, a Certified LiveNote Reporter, and Notary Public, held at the Offices of HOGAN LOVELLS US LLP, 875 Third Avenue, New York, New York 10022, on Friday, June 8, 2012, commencing at 10 a.m.

context to understand it. But, I mean, I would want to look at how it's prepared and what was done.

Q. So first ingredient -- so first component, second component, under your definition, could be the exact same ingredient?

I just want to understand your position.

Yes or no?

MS. CHOW: Objection to the form.

A. I wouldn't --

Q. That's your position?

A. I wouldn't rule that out, no.

Q. You wouldn't rule what out?

A. That there -- I wouldn't rule out that they -- I wouldn't say that they could not be. They can be the exact same ingredient, but they may be processed -- I just have to look at the context.

Q. Okay. Well, let's start with claim one.

A. Correct.

Q. Two different ingredients, correct, first component, second component?

MS. CHOW: Objection to the form.

A. I don't read it that way.

Q. Are there any examples in that patent, in the file history, with the same ingredients mixed together to achieve a so-called cushioning effect to prevent cracking?

MS. CHOW: Objection to the form.

A. Although there are no examples, examples aren't limited -- are not limiting.

Q. In other words non-limiting?

A. Non-limiting. I use the word -- I would rather use the word "not limiting."

Q. So let me just back up.

So you are saying that the sustained release agent and the enteric coating agent can be the exact same ingredient?

MS. CHOW: Objection to the form.

A. Well, I am just reading the patent where it says "methacrylate copolymers"; and it says -- it says the "aqueous enteric" -- I am on

column nine, line 27. It says:

"The aqueous enteric coating polymer agent is preferably a methacrylate copolymer. The sustained release agent is preferably a methacrylate copolymer."

Q. So my -- the answer to my question is "yes," that's your position?

A. Right, I think it's consistent with the patent, also.

Q. So then let me ask you this:

How do you reconcile your position with the -- in column nine, where it says:

"The sustained release agent is used in an amount of 5 to 30 weight percent, preferably 5 to 15 weight percent" -- and then it goes on.

MS. CHOW: What is your question?

Q. How do you reconcile the fact that you can use the same ingredient at the same time this patent here, column nine, is suggesting that one has to be in an amount relative to the other?

It seems a little inconsistent.

A. You know, you just have to look at the context of it.

Q. Is it inconsistent, though; would you agree?

A. I don't think it's inconsistent. To go further, I need to look at the context.

Q. So everything about this whole process is context. Right? You have to have everything in context, it seems like.

MS. CHOW: Objection to the form.

A. I think that's -- I think generally that's correct. Now, there may be some instances; but, generally, in the formulation field, it's pretty context-based.

Q. Okay. But just to back up, though, there are no examples in the intrinsic evidence in the specification at all showing the use of the two -- the two same ingredients to form the enteric coating layer?

MS. CHOW: Objection to the form. Asked and answered.

have different meanings?
A. I am not sure that that is correct.
Q. Okay.
A. I mean, I'm not sure -- maybe I'm not sure what you are asking me. But I'm not sure. I wouldn't parse it down that way. Maybe that's a better way to say it.
Q. You wouldn't parse it down which way, that they would have different meanings?
A. You seem to be saying that, if something is an enteric coating agent, it can't be anything else, and vice versa. And there are lots of excipients that have multiple functions. So I'm not sure you can say that. You have to look at the system.
Q. Okay. So I am asking you, though, as the person who is sitting here today defining the claim, who put a declaration in --
A. Right.
Q. -- enteric coating agent and sustained release agent have different meanings, correct?

I need an answer to that question. You haven't given me an answer to that question.
MS. CHOW: Objection to the form. Asked and answered.
A. Okay. So a sustained release agent, in my declaration, can be a methacrylate copolymer.
Q. That's the same definition as you give an enteric coating agent. So then is it your testimony that they have the same meaning?
If that's your position, that's fine, I will move on.
MS. CHOW: Objection to the form. Asked and answered.
A. Another thing I say is numerous references define enteric coating agents and sustained release agents as a methacrylate copolymer.
Q. So you are giving the two claim limitations the same meaning. I don't understand what is so complicated about the question.

Are you giving them the same meaning, right? You are defining them --
A. I don't think I am. The complicated thing is I don't think I am giving them the same meaning.
Q. You call them both methacrylate copolymers, right?
A. Right.
Q. That's how you define them in your declaration?
A. Right.
Q. That's the same words?
A. No, because there are hundreds of methacrylate copolymers, or at least 20 of them.
Q. Your position is a sustained release agent is, defined by you, a methacrylate copolymer, right?
A. Right. Well, it's not defined by me. It's in the patent.
Q. Okay. And it's also in your view that the enteric coating agent is also defined in the patent as a methacrylate copolymer?

A. Correct.
Q. And that's how you define it as well?
A. Well, an enteric coating agent has to also have acid resistance. It has to be a methacrylate copolymer that has acid resistance.
Q. But the sustained release agent doesn't have to?
A. Correct.
Q. Okay. Let me just place in front of you what is marked as Defendant's Exhibit 22 and 23, product specifications for Eudragit 100-55 and L 30 D-55. I'm sorry -- Eudragit --
MS. CHO: One's L 30 D-55, another one is L 100-55.
(Exhibit No. D 22, Product Specifications for Eudragit, is marked by the reporter for identification.)
(Exhibit No. D 23, Product Specifications for Eudragit, is marked by the reporter for identification.)
Q. Can you just confirm that the

it, the wild, wild west?
A. Correct.
MS. CHOW: Objection to the form.
A. I don't think it's indefinite, but I think it's quite a bit larger. I think I am being very fair to put a 10 percent number on it.
Q. Well, are you being subjective, or are you being objective about it?
A. I think I am being objective, but I think I am being fair. And I think I am being fair.
One of the reasons I don't think it's indefinite is because the FDA required particle size specifications. And there were lots of particle size specifications being set in that time frame, and people were passing specifications. And so there was a way to get reasonable measurements of particle size in that time frame. But the errors were as I described them.
Q. These two distinct concepts, the

precision of the instrument itself and also the precision of the measurement, okay, if I understand it --
A. Well, there is actually three different precisions of the measurement.
Q. Three. So let's go over them.
The precision of the instrument, the precision of the measurement of the sample --
A. And there are three levels of that as described by Snorek. One of them is repeatability, precision repeatability; one of them is intermediate precision; and one of them is reproducibility.
Q. So then just -- maybe I am confused. What is the third one?
A. The instrument precision. So there are four total precisions that we can talk about.
Q. Now, you --
MR. PARKER: I don't know what I marked this as I didn't write it down, this

document here.
MS. CHOW: It's 21.
Q. Now, going through this document, if you look at the page which I know you are quite familiar with, so let's just go right into it.
The section of conversion, of scattering patterns into particle size distribution, do you see that?
A. Yes.
Q. And it sets out -- it says:
"The algorithms used are specific to each make and model of equipment and are proprietary. Differences in the algorithms between different instruments can give rise to differences in the particle size statistics."
Do you see that?
A. Yes.
Q. And do you agree with that statement?
A. Yes.
Q. And then it goes on to say, when

you are reporting particle size distribution -- and it goes on, you want to be able to report the cell type, sample state, and preparation, together with the make and model of the equipment. Right?
A. Now, I am just -- I am not seeing all of that. I am seeing part of that.
Q. At the bottom of the page where it begins.
A. Okay, I see it. Correct.
Q. Now, why would you have to report the make and model of the equipment?
A. Because of the previous statement.
Q. Are we dealing with the instrument precision?
A. The algorithms used are specific for each make and model of equipment.
Q. Now, are you on the editorial board of any peer-reviewed journals?
A. Yes.
Q. If someone was submitting data using the Helos Rodos, what would you expect

would not know how they got that number.
MS. CHOW: Objection to the form.
Q. When -- I mean "number," I am talking about the patent.
MS. CHOW: Objection to the form.
A. No, I mean, a person skilled in the art reading a patent would assume, like they would reading a paper from J Pharm Sci, that the measurement was made on the Helos Rodos as described, and -- or -- and they got these numbers. And then they would do the same analysis I am doing and say they are plus or minus 10 percent. And that's conservative.
I'm doing the same analysis I think a person skilled in the art would do.
Q. Based -- okay. And you have a -- the documents that you rely on to support your analysis, you will agree, were published after the filing date?
A. But the documents I am using -- that's correct. But my analysis is based on my experience at the time. And I think, again,

just to keep repeating, it's conservative. The numbers I put in here are conservative.
Q. One of ordinary skill in the art obviously can't go to the Snorek argument or the USP in '99 because they didn't exist, and that's just pretty simple, right?
MS. CHOW: Objection to the form.
Q. They didn't exist. They were nonexistent. So how could they go to it?
A. Although they couldn't go to them, they would come out with the same analysis -- this is my opinion -- or even worse. But -- or above 10 percent. But my opinion is that 10 percent is a conservative number based on all of my analysis. I think that's what a person skilled in the art would come up with.
Q. And a person of ordinary skill in the art would, in your view, disregard any direct information about the specific device itself, the Helos Rodos?
MS. CHOW: Objection to the form.
A. The reason they would disregard

that is because they would immediately realize that that is simply instrument precision. That doesn't provide the information on the errors that really happen that the patent is addressing.
Q. Okay. And, again, the patent just gives you the number. They don't tell you or explain how that number came up, how they came up with that number?
MS. CHOW: Objection to the form.
A. Well, they give us the Helos Rodos, the information on that instrument. And there are other methods of measurement. And from -- a person skilled in the art can figure out from how they are told to do the -- from the Helos Rodos, how to carry out the measurements.
So it's not indefinite for the patent -- skilled -- person skilled in the art to figure out how to make the measurements or what they mean.
Q. And one skilled in the art, well --
Okay. Now, just staying on the USP

just for a minute, there's no page, but it's Bates No. 226, right-hand corner, Exhibit 25.
A. 25.
Q. I'm sorry. Exhibit 25, the Bates No. is 226.
MS. CHOW: You have got the wrong one. 24, Exhibit 24. USP, right?
MR. PARKER: No, no. This one.
MS. CHOW: 29.
THE WITNESS: The one I have is 29. I am not seeing any Bates numbers on it.
MR. PARKER: Well, maybe my copy is different.
MS. CHOW: Which page of --
THE WITNESS: There are pages of it --
MR. PARKER: It's the next-to-last page. It deals with accuracy and repeatability.
MS. CHOW: Okay.
Q. I just -- where it says, "The response of a laser diffraction instrument is considered adequate," and it goes on, do you see

that? Then it has a value of 3 percent.
Can you just explain what that -- that is referring to, and how to distinguish over what they are talking about it replicates, if you can?
A. So this is using a certified reference standard. So you buy this material from the USP, and we had to -- actually, the NIST probably has the best one. We have had a lot of discussion of where the best reference material comes from. And these are all spheres, glass spheres of this, exactly the same particle size.
So you stick -- you put those in there, and they're supposed to come out within plus or minus 3 percent. But those are, you know, not real samples. Those are standards. Those are somewhere between the Helos Rodos and the first level that Snorek uses.
Q. And would that --
A. Or the first level they are talking about here, because they are not real samples.

Q. Would they be used for calibrating the machine?
A. Yes, they are --
Q. For calibration purposes?
A. Well, they are -- here they are using them for validation, but you would use similar things for calibration.
Q. Of the ways of measuring particle size -- optical microscopy, sieving, sedimentation, laser diffraction -- which has the greatest variation?
MS. CHOW: Objection to the form.
Q. At least as of 1999, what was known.
A. I don't know that I could give an exact number which is the greatest, but, in my opinion, they are all higher than laser diffraction.
Optical microscopy suffers from the problem that you don't have good statistics. You probably need to analyze 100,000 particles or some large number of particles, and you can't

get those on a microscope. You can't get enough statistics to get a good number.
And sieving has a problem with the different particle shapes. It also has a problem with charging. If you have particles that are charged, then they get electrostatic, and it doesn't give you good numbers.
What was the third method?
Q. Sedimentation.
A. Yes, I don't know that that is widely used in the industry except for very small particles.
The USP had a conference on all of these methods in 1994, and I spoke at it. And it dealt with all of this.
Q. Is that information published?
A. Yes.
Q. Now, just staying with the '994 patent for a second. If you look at column 1, there is a reference to a patent JPA -- a Japanese patent, column 1, lines 30 to 38.
Do you recall or did you review

that piece of prior art?
A. No. I don't recall reviewing it. I don't think I did. I think it's probably in Japanese.
Q. And then also in the EP publication down below, two paragraphs down where it talks about particle size 100 to 100 micrometers, it's on lines 44 to 53.
A. Correct.
Q. Okay. Now, in the background, would you agree that here the -- the inventors are basically calling out and distinguishing the claimed invention based upon the particle size?
MS. CHOW: Objection to the form.
Q. Particle distribution.
A. Well, I think they are distinguishing a number of other things, also. But they are mentioning particle size in their discussion.
Q. And obviously these references -- well, let me back up. In describing these references, they are indicating that there --

Q. And given the difficulties in manufacturing as you have outlined them in your declaration -- so it's your position that someone with a bachelor's degree and four years of experience in formulation could essentially solve the same problems that the inventors of the '994 patent could have solved?
MS. CHOW: Objection to the form.
A. That's my opinion. I mean, the four years of formulation experience would be the equivalent of a Ph.D.
Q. Right.
A. So it's quite a bit of experience.
Q. So you guys are not -- I'm being a little lax here -- it's not too far off in your definitions?
A. Correct.
Q. Then on page 13 of your report, that -- on paragraph 42, just staying with "the person of ordinary skill in the art," then the individuals -- you described that person would have been able, as Dr. Shimizu has done -- was

basically he recognized that the mixing of sustained release agents with the enteric coating agent prevented damage to the enteric coat?
MS. CHOW: Objection to the form.
A. Well, they would need his declaration. They would be able to analyze his data and figure that out.
Q. What if a person of ordinary skill was faced with a problem of trying to find ways to avoid damaging -- tablets getting damaged at the compression? They would be able to recognize what Dr. Shimizu did, essentially, was basically the incorporation of sustained release agent and enteric coating agents together?
MS. CHOW: Objection to the form.
A. No, I'm not sure of that. I think that's part of the invention. I don't think that would be apparent to somebody to do that to minimize shock damage or compression damage.
Q. Okay. I see the confusion. Okay. Try -- do this. Okay. So let me just start

from the beginning. I am not trying to get into an obviousness analysis. I am trying to not confuse you, throw you off.
Basically, Dr. Shimizu discusses in his patent the difficulties in preparing, tableting fine granules. And one of the problems he was faced with -- my interpretation, you can agree or not agree -- is that there are issues of, when you are tableting, that, during compression, they crack -- the coatings crack; the enteric coatings crack, will crack.
Am I accurately yet briefly characterizing his --
A. That's one of the problems. I mean, I outlined the difficulties earlier, but that's one of the problems.
Q. That's right. You did.
In fact, Dr. Shimizu revolved that problem, recognizing that if you add -- however you called it -- add a mixture of enteric coating agent or sustained release agent, that you will avoid those problems?

MS. CHOW: Objection to the form.
A. I will just go with the claims. The combination of coatings, two compositions, like are said in the claims, avoid the problems. So the claims say they don't require an admixture. They just say -- well, I should -- that's -- I just want to get this right -- "coated by a first component which is an enteric coating agent and a second component which is a sustained release agent."
Q. Right.
A. Then in the patent, as we were discussing this morning, it allows both of those to be methacrylate polymer.
Q. Right.
A. So I am just going with that.
Q. That's right. And then in all of the -- in the examples, the way he -- in the examples that he has laid out in the specification -- we went over this before -- is that he essentially was able to combine the two ingredients together which, in his view,

resolves the problems that you talked about earlier with respect to formulating an ODT?

MS. CHOW: Objection.

Q. Right?

MS. CHOW: Objection to the form.

A. Well, in the examples he used one method of doing the claim. But that doesn't mean that there aren't other methods, and the examples are not limiting.

Q. Okay. But a person of ordinary skill in the art, would they have -- so, basically, someone with a bachelor's degree and four years of experience would be able to simply resolve all of the technical difficulties in the ODT formulating field as you describe them?

MS. CHOW: Objection to the form.

A. I think so. I mean, that's what I am saying. I think Dr. Shimizu himself didn't have a Ph.D., or Mr. Shimizu didn't have a Ph.D.

Q. Okay. Do you know whether he had a Ph.D. or not?

A. I don't think he did, but now maybe

I am wrong.

Q. I don't know.

THE WITNESS: What exhibit is Shimizu? Is this his?

MS. CHOW: I think it's 17.

(There was a discussion off the record.)

A. Yes, he graduated with a bachelor's degree and then worked at Takeda, starting in 1988, in Takeda's Osaka office.

Q. Now, on paragraph 44 of your declaration you have "enteric coating layer."

Do you see that?

And you have it defined as "constructed by its" -- plural -- "layers"?

A. Correct.

Q. But that doesn't take away the fact that the claims still require sustained release agent as part of the enteric coating layer, right?

MS. CHOW: Objection to the form.

A. Well, I mean, the claims say a

first component which is an enteric coating agent and a second component which is a sustained release agent. So I'll just go with that.

Q. What do you mean? I don't know what you mean by that.

A. Well, I am just -- I wasn't asked really to get into a detailed claim interpretation. But just reading them on the face, they say you have to have a first component, which is an enteric coating agent, and a second component, which is a sustained release agent.

Q. Okay. So the claim -- let me back up.

A. Here I am saying the enteric coated agent could be plural.

Q. Okay. Aren't you saying the enteric coating layer may be constructed by plural layers? That's what you are saying there, right?

A. Right. But I am not requiring --

maybe another way I could phrase it is -- back to what we were talking about -- the examples blended enteric coating agents, sustained release agent. But I am not requiring that. I don't remember them to be blended because of the way the claims are written.

But, also, I want to just add that I haven't done a complete analysis of the claims either. And here it's saying that you can have two enteric coating layers.

Q. And the way the claim reads is, basically, the enteric coating layer must consist of an enteric coating agent and a sustained release agent, at least according to the claim?

MS. CHOW: Objection to the form.

A. Well, I guess all I'd say is an enteric coating layer comprising a first component and a second component. I guess you could have another enteric coating layer that was -- didn't comprise two components, as long as you had one that comprised those two